**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNICE M. SIMMONS, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:20 CV 1342 SRW |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant(s). | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on review of an adverse ruling by the Social Security

Administration. The Court has jurisdiction over the subject matter of this action under 42 U.S.C.

§ 405(g). The parties consented to the exercise of authority by the United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. ECF

No. 25. Defendant filed a Brief in Support of the Answer. ECF No. 27. Plaintiff did not file a

Reply. The Court has reviewed the parties' briefs and the entire administrative record, including

the transcripts and medical evidence. Based on the following, the Court will affirm the

Commissioner's decision.

**I.     Factual and Procedural Background**

On January 16, 2018, Plaintiff Unice M. Simmons protectively filed an application for

disability insurance benefits (DIB) under Title II, 42 U.S.C. §§ 401, *et seq.* Tr. 185-86. Plaintiff's

---

[1] At the time this case was filed, Andrew M. Saul was the Commissioner of Social Security. Kilolo Kijakazi became the Commissioner of Social Security on July 9, 2021. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name, and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Kilolo Kijakazi for Andrew M. Saul in this matter.

application was denied on initial consideration, and she requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 85-89, 92-95.

Plaintiff and counsel appeared for a hearing on June 28, 2019. Tr. 30-48. Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. *Id*. The ALJ also received testimony from vocational expert Deborah Determan, M.S. *Id*. A supplemental hearing was held on January 3, 2020, in which the ALJ received additional testimony from medical expert Howard Shapiro, M.D., vocational expert Stephen J. Dolan, M.A., and Plaintiff. Tr. 49-73.

On February 19, 2020, the ALJ issued an unfavorable decision finding Plaintiff not disabled. Tr. 9-20. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council. Tr. 181-84. On August 26, 2020, the Appeals Council denied Plaintiff's request for review. Tr. 1-6. Accordingly, the ALJ's decision stands as the Commissioner's final decision.

With regard to Plaintiff's testimony, medical records, and work history, the Court accepts the facts as presented in the parties' respective statements of facts and responses. The Court will discuss specific facts relevant to the parties' arguments as needed in the discussion below.

## II.    Legal Standard

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy[.]" §
1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the
claimant has a disability. 20 C.F.R. § 416.920(a)(1). First, the Commissioner considers the
claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is
not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner
looks to see whether the claimant has a severe impairment "which significantly limits claimant's
physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th
Cir. 2010); *see also* 20 C.F.R. § 416.920(a)(4)(ii). "An impairment is not severe if it amounts
only to a slight abnormality that would not significantly limit the claimant's physical or mental
ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also*
20 C.F.R. §§ 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the
impairment's medical severity. If the impairment meets or equals one of the presumptively
disabling impairments listed in the regulations, the claimant is considered disabled, regardless of
age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the
presumptively disabling impairments, the Commissioner assesses whether the claimant retains
the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§
416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined as the most a claimant can still do
despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir.
2011); *see also* 20 C.F.R. § 416.945(a)(1). While an RFC must be based "on all relevant

evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016).

Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC, and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work which exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work which exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

If substantial evidence on the record as a whole supports the Commissioner's decision, the Court must affirm the decision. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. Under this test, the Court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id*. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

## III.    The ALJ's Decision

Applying the foregoing five-step analysis, the ALJ found Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2017, and has not engaged in substantial gainful activity during the period from her alleged onset date of May 31, 2013 through her date last insured of December 31, 2017. Tr. 14. Plaintiff has the severe impairment of lupus profundus. *Id.* Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.* The ALJ found Plaintiff had the following RFC through the date last insured:

> [Plaintiff] had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: She is unable to climb ladders, ropes or scaffolds, but [s]he can occasionally climb ramps or stairs, stoop, kneel, crouch and crawl. She is unable to push or pull with her upper extremities on more than an occasional basis. She is unable to reach overhead bilaterally. She is to avoid concentrated exposure to extreme cold and heat. She is to avoid concentrated exposure to irritants such as fumes, odors, dust, gases, or poorly ventilated areas.

> She is to avoid extreme vibration, all operational control of moving machinery,
> working at unprotected heights, and the use of hazardous machinery.

Tr. 15-18. The ALJ found Plaintiff was unable to perform any past relevant work as a teacher's assistant. Tr. 18-19.

The ALJ further found Plaintiff was born on March 12, 1969, and was 48 years old, which is defined as a younger individual age 18-49, on the date last insured. Tr. 19. Plaintiff has at least a high school education and is able to communicate in English. *Id*. The ALJ determined the transferability of job skills was not material to the determination of disability because, using the Medical-Vocational Rules as a framework, it supported a finding that the claimant was "not disabled," whether or not the claimant had transferable job skills. *Id*.

Relying on the testimony of the VE and considering Plaintiff's age, education, work experience and RFC, the ALJ found there were jobs existing in significant numbers in the national economy which the Plaintiff could have performed, including representative occupations such as food and beverage order clerk (*Dictionary of Occupational Titles* ("*DOT*") No. 209.567-014); cashier (*DOT* No. 211.462-010); and telephone solicitor (*DOT* No. 299.357-014). Tr. 19-20. The ALJ concluded Plaintiff was not under a disability from May 31, 2013, through the date of his decision on December 31, 2017. Tr. 20.

## IV.  Discussion

As an initial matter, the Court notes Plaintiff's insured status is relevant in this case. Plaintiff alleged an onset of disability date of May 31, 2013. Her insured status expired on December 31, 2017. To be entitled to benefits under Title II, Plaintiff must demonstrate she was disabled prior to December 31, 2017. *See* 20 C.F.R. § 404.130. Thus, the relevant period for consideration in this case is from her alleged onset date to her expired status date.

Plaintiff challenges the ALJ's decision on two grounds: (1) the ALJ failed to properly evaluate her RFC by neglecting to consider the effects of her lesions, pain, and itching; and (2) the ALJ's credibility assessment was not supported by substantial evidence. For the following reasons, the Court finds the ALJ's decision is based on substantial evidence in the record as a whole, and it is consistent with the Social Security Administration Regulations and case law.

### A. Formulation of Plaintiff's RFC

Plaintiff asserts that substantial evidence in the record shows she suffers from lesions, pain, and itching on her head, scalp, and face, secondary to lupus profundus. She argues the ALJ committed reversible error by failing to consider the effects of those symptoms on her ability to concentrate, persist, and maintain attendance at work. Plaintiff points to her testimony in which she stated the itching, pain and lesions were a frequent distraction, would interfere with her ability to remain on task, and would cause her to be absent from work when the lesions were "oozing." Plaintiff also cites to various medical records in which she complained of such symptoms to her treating providers.

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184 (July 2, 1996). "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (quotation and citation omitted). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Cox v. Astrue*, 495 F.3d

614, 619 (8th Cir. 2007). Nonetheless, there is no requirement that an RFC finding be supported by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

Additionally, an ALJ is not limited to considering only medical evidence in evaluating RFC. *Cox*, 495 F.3d at 619; *see also Dykes v. Apfel*, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [plaintiff] is arguing that residual functional capacity may be proved only by medical evidence, we disagree."). The ALJ may consider a plaintiff's daily activities, subjective allegations, and any other evidence of record when developing the RFC. *Hartmann v. Berryhill*, No. 4:17-CV-002413-SPM, 2018 WL 4679737, at *6 (E.D. Mo. Sept. 28, 2018) (citing *Cox*, 495 F.3d at 619-20). Although the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox*, 495 F.3d at 620; 20 C.F.R. §§ 416.927(e)(2), 416.946.

Plaintiff bears the burden of proving her RFC. *See Moore*, 572 F.3d at 523. Ultimately, a plaintiff is responsible for providing evidence relating to her RFC, and the Commissioner is responsible for developing the plaintiff's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the plaintiff] get medical reports from [the plaintiff's] own medical sources." *Turner v. Saul*, No. 4:18-CV-1230-ACL, 2019 WL 4260323, at *8 (E.D. Mo. Sept. 9, 2019) (quoting 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)).

In determining Plaintiff was capable of performing sedentary work with additional postural and environmental restrictions, the ALJ first considered her Function Report and hearing testimony. Tr. 16. Within the Function Report, dated February 25, 2018, Plaintiff asserted she was unable to maintain employment because of extreme fatigue and pain in her joints and lower back. Tr. 16, 229. Plaintiff did not mention disability due to lesions, itching, or

scalp/facial pain. Plaintiff reported she assisted her father in attending his dialysis and doctor appointments, had no issues maintaining her personal care, and was able to prepare her own meals, wash clothes, drive, go out alone, shop for groceries on a weekly basis, and manage her finances. Tr. 16, 229-39. Plaintiff asserted she could not, however, perform yard work because of joint pain and adverse skin reactions to sun exposure. Tr. 16, 231.

At the June 28, 2019 hearing, Plaintiff testified to experiencing symptom flare ups approximately once per month. Tr. 16, 40, 43. She explained her "scalp becomes really red and then in the course of that it breaks into a lesion, open wounds." Tr. 40. She has received steroid injections to reduce the inflammation and prevent the lesions from spreading, but asserted the injections no longer help. Tr. 41. During flare ups, Plaintiff stated she experiences occasional headaches, fatigue, and pain in her joints and lower back. *Id.* When fatigued, Plaintiff stated she needs to lie down. Tr. 41-42.

At the January 3, 2020 hearing, Dr. Howard Shapiro, a non-treating State agent physician, testified as a medical expert. Tr. 16, 52-60. After confirming his review of the record, he identified Plaintiff's diagnosis as lupus erythematosus. Tr. 53. He stated she was originally diagnosed with this condition at nineteen years of age. *Id.* Dr. Shapiro described her symptoms as persistent skin involvement, primarily of the face, which has required treatment with prednisone and injections of steroids into the lesions. Tr. 53, 56. He confirmed that itching and pain are two usual symptoms of Plaintiff's condition. Tr. 60. Dr. Shapiro stated, "that virtually all of her medical care has been directed at dermatological problems and not at back problems." Tr. 55. He opined she did not meet or equal any listed impairment, and her symptoms would not interfere with her ability to work. Tr. 57-59. The ALJ found Dr. Shapiro's opinion to be

persuasive as it was "well supported by his review of the record and consistent with the record as a whole." Tr. 18.

The ALJ then summarized the underlying medical and opinion evidence, and determined that although Plaintiff's impairments could reasonably be expected to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects were not entirely consistent. Tr. 16. The ALJ explained he could "not find evidence to support, not only the frequency alleged, but also the severity of pain and fatigue that accompanies the flare-ups." *Id.* The Court notes that the ALJ's determination references every relevant medical record from the applicable time period.

On November 21, 2014, Plaintiff appeared to Dr. Sofia Chaudhry, and her resident, Dr. Erin Burns, at the SLUCare Department of General Dermatology for a rash on her face and scalp. Tr. 16, 279-93. Dr. Chaudhry indicated in her treatment notes that Plaintiff had not followed up with her rheumatologist for approximately ten years. Tr. 16, 288-89. Her physical examination was normal, except for the following dermatological issues: non-scaly sclerotic plaques with central hypopigmentation and peripheral hyperpigmentation with mild surrounding erythema and scarring alopecia on crown scalp and left temporal scalp; mottled hyperpigmented indurated plaque with few pink papules on submental chin with evidence of few dark coarse hairs; hyperpigmented scaly patch with follicular plus in left conchal bowl; and marked symmetric facial lipoatrophy of periorbital area, bilateral temples and buccal fat of cheeks. Tr. 16, 291. Plaintiff reported this was "an average day for her lupus" in combination with "occasional fatigue." Tr. 16, 290. Dr. Chaudhry adjusted her medications. Tr. 16, 291.

On December 19, 2014, Plaintiff appeared for a follow up visit with Dr. Chaudhry and her resident, Dr. Maulik Dhandha. Tr. 16, 294-301, 774-78. Plaintiff described her condition as

"about the same." Tr. 16, 299. Her physical examination was normal, except for scaly hyperpigmented and erythematous, thin papules on scalp with some scarring alopecia on the right side of her forehead and left conchal bowl, as well as marked facial lipoatrophy of periorbital, temples, buccal fat. Tr. 299. Plaintiff indicated her desire to restart Plaquenil[2] for treatment because it "helped her before." Tr. 300.

On January 26, 2015, Plaintiff reported improvement after restarting Plaquenil. Tr. 305. A physical examination revealed pink hyperpigmented plagues on her scalp and forehead. *Id.* On April 27, 2015, Plaintiff reported significant improvement with Plaquenil, and Dr. Chaudhry noted her scalp and forehead were no longer pink. Tr. 16, 311. On September 14, 2015, Dr. Chaudhry indicated Plaintiff was doing significantly better and had no concerns regarding her treatment. Tr. 16, 318.

On January 5, 2016, Plaintiff saw Dr. Raymond E. Bourey, and his resident, Dr. Kiran Relekar, at SLUCare for a thyroid check. Tr. 17, 324-31. Notably, Plaintiff complained of only mild fatigue and was negative for rashes, lesions, and ulcers upon physical examination. Tr. 327, 329. On January 8, 2016, Plaintiff appeared for an eye exam to rule out any ocular side effects from the Plaquenil prescription. Tr. 17, 332-42. Plaintiff's examination was normal, other than a recommendation for her to wear reading bifocals as needed. Tr. 17, 340.

On January 25, 2016, Plaintiff appeared for a follow up appointment with Dr. Chaudhry. Tr. 17, 343-50. Although Plaintiff reported a mild flare, she described her overall condition as "stable," reported she was "feeling well," and denied joint pain, fatigue, and oral ulcers. Tr. 343, 348. Dr. Chaudhry noted she had "mild erythema on left frontal scalp overlying alopecic patches

---

[2] Plaquenil or Hydroxychloroquine is a medication used, in part, to treat lupus and decrease the onset of disease flares. *See* Lupus Foundation of America, available at https://www.lupus.org/resources/drug-spotlight-on-hydroxychloroquine (last visited Oct. 5, 2021).

with hyperpigmentation" and "unchanged facial lipoatrophy." Tr. 347. Dr. Chaudhry attributed the mild flare to Plaintiff's decision to stop taking her Quinacrine[3] prescription due to cost; however, Plaintiff confirmed she could now resume her dosages with no issues. *Id.*

On April 25, 2016, Dr. Chaudhry noted a "slight improvement" since resuming Quinacrine. Tr. 17, 355. Plaintiff denied pain, itching of her scalp, and joint pain. Tr. 356. However, she did admit to fatigue. *Id.* On September 26, 2016, Dr. Chaudhry described Plaintiff's lupus as "well-controlled" with "mild erythema." Tr. 17, 364, 367. On October 24, 2016, Plaintiff reported her medications, Plaquenil and Quinacrine, "help keep the skin lesions from flaring." Tr. 685. Plaintiff was offered and agreed to a Kenalog steroid injection. Tr. 367. On November 28, 2016, despite presenting with a "flare of indurated plaque on left upper forehead," Plaintiff reported her lupus to be "the same or better than before." Tr. 372, 376. Dr. Chaudhry offered her another Kenalog injection, but she declined as she wanted to avoid the pain associated with an injection. Tr. 17, 376.

On February 13, 2017, Plaintiff reported an increased flare with a persistent red spot at the left side of her scalp, but described her overall condition as "ok." Tr. 17, 384-85. Plaintiff also reported "sore/active areas in her scalp especially with menstrual cycles," which would resolve after approximately a week and a half. Tr. 385. *See also* Tr. 678 (Plaintiff reported history of increased flare ups during her menstrual cycle to her gynecologist). Plaintiff admitted to Dr. Chaudhry that she had not taken her Quinacrine prescription since December of 2016 due to cost, but would like to restart it. Tr. 17, 384, 386. Despite her flare up and medication non-compliance, Dr. Chaudhry described her condition as "stable" overall. Tr. 385, 387.

---

[3] "Quinacrine has been used as an antimalarial drug and as an antibiotic. It is used to treat giardiasis, a protozoal infection of the intestinal tract, and certain types of lupus erythematosus, an inflammatory disease that affects the joints, tendons, and other connective tissues and organs." *See* Nat'l Library of Medicine, available at https://pubchem.ncbi.nlm.nih.gov/compound/Quinacrine (last visited Feb. 7, 2022).

On May 15, 2017, Plaintiff appeared for a follow up with Dr. Chaudhry in which she reported continued flare-ups, but otherwise felt her "skin condition has improved some" with decreased redness and no systemic symptoms. Tr. 17, 401, 407. Plaintiff also reported being very stressed because her mother was ill, and she was caring for her. Tr. 17, 406. A physical examination revealed pink scaly plaques on the left side of her forehead and scalp. Tr. 406. Dr. Chaudhry and her resident, Alexander Ernst, M.D., recommended medication changes, but Plaintiff did not wish to make any adjustments at the time of the appointment due to her focus on her mother's illness. Tr. 17, 409, 411.

Ophthalmology treatment notes from August 24, 2017, indicate Plaintiff's development of an asymptomatic retinal hole. Tr. 17, 415, 430. Plaintiff confirmed she was able to drive with no issues and could read with glasses. Tr. 17, 415-26. Plaintiff was provided with the options of laser retinopexy or no treatment with continued observation. Tr. 425. Plaintiff chose the latter treatment option. At her December 7, 2017 follow up ophthalmology appointment, she denied any concerns, and her eye examination was normal. Tr. 432, 437-38.

The Court notes that a portion of the underlying record includes treatment notes from 2018 and 2019, which are outside of the relevant time period. *See* Tr. 17, 454-66, 498-507, 513-48, 558-600, 606-26, 632-65, 742-750, 817-48, 907-29, 983-1047. However, the ALJ noted these treatment notes reflect Plaintiff began to report pain in her elbows and back, which evidenced scoliosis and SI joint tenderness, around August of 2018. Tr. 17, 574-76. An August 10, 2018 radiological exam of her hips and back revealed normal results, other than some degenerative changes. Tr. 17, 618. The ALJ also referenced a February 11, 2019 treatment note which documented Plaintiff's report that she had stopped taking care of her condition since 2018 because she was preoccupied with being a caregiver for her aunt and father, as well as a March

13

13, 2019 treatment note indicating she had dermatological, not systemic lupus. Tr. 17, 598-99, 640. Otherwise, the ALJ did not include a summary of these records in his determination because they document treatment occurring after Plaintiff's insured status expired.

The ALJ further considered the non-treating State Agent opinion of Dr. Kevin Threlkeld, dated March 12, 2018, who limited her to light work with additional postural limitations. Tr. 18, 77-79. The ALJ found this opinion to be "well supported and consistent with the record as he reviewed, but the subsequent records and the opinion of the medical expert [Dr. Shapiro] indicated greater limitations." Tr. 18.

The ALJ considered the two-page Summary Impairment Questionnaire completed by Dr. Chaudhry on July 30, 2018. Tr. 18, 555-56. Dr. Chaudhry indicated Plaintiff's symptoms to include pain, redness, and swelling on the face and scalp, and low back pain. Tr. 555. Dr. Chaudhry opined Plaintiff could do the following in an 8-hour workday: stand or walk up to one hour, occasionally lift or carry up to five pounds, occasionally use upper extremities to handle objects, occasionally use hands/fingers for fine manipulation, occasionally use upper extremities to reach, and never push or pull. Tr. 556. Dr. Chaudhry further opined Plaintiff would be absent more than three times per month. *Id.* The ALJ found this opinion to be unpersuasive because it "did not indicate that it applied to the relevant period, was unsupported by his records, and was inconsistent with the record as a whole." Tr. 18.

The ALJ considered the Medical Statement of Ability to do Physical Work-Related Activities, which was submitted by non-treating physician, Dr. John Anigbogu, on July 19, 2019. Tr. 18, 795-802. Dr. Anigbogu opined Plaintiff could frequently lift up to ten pounds; occasionally lift or carry up to twenty pounds, never lift or carry more than twenty pounds; continuously carry up to ten pounds; sit for six hours in an eight-hour workday; stand or walk for

three hours in an eight-hour workday; continuously reach, handle, finger, feel, push and pull, and operate foot control; continuously climb stairs, balance, stoop, kneel, crouch and crawl; and never climb ladders or stairs. Dr. Anigbogu noted she did not use an ambulation device and had no impairment affecting her hearing or vision. As for environmental limitations, he opined she could not work at unprotected heights; could frequently be exposed to dust, odors, fumes, pulmonary irritants, extreme heat, vibrations, and loud noise; and could continuously work with moving mechanical parts, operate a motor vehicle, and be exposed to humidity or wetness and extreme cold. He further found she could shop, travel alone, walk a block at a reasonable pace on rough or uneven surfaces, use public transportation, climb a few steps at a reasonable pace with the use of single handrail, prepare simple meals and feed herself, care for her personal hygiene, and sort, handle, or use paper or files. The ALJ found Dr. Anigbogu's opinion to be persuasive and limited the claimant to sedentary work due to the standing and walking limitation falling between exertional categories. The ALJ determined, however, that Plaintiff required additional overhead reaching and environmental limitations based on her testimony and statements regarding issues with such activities.

After summarizing the underlying medical record and evaluating the physician opinions, the ALJ further explained his basis for determining she could perform sedentary work with additional postural and environmental restrictions:

> The record was not consistent with the claimant's allegations regarding the frequency or severity of her outbreaks. They were localized on her face and head and did not impair her extremities. Her records indicated that she did have exacerbations, but the undersigned notes that these were predominately during periods of noncompliance due to the extensive nature of her medications. She went to regular eye exams due to the high dose of medications, but there was no evidence of substantial side effects. The claimant did not usually report fatigue and if she did it was mild. There was some evidence of degenerative changes in the claimant's spine, but the description was vague in the radiology reports. Although there are limited findings regarding the claimant's upper extremities,

the undersigned found sufficient support that the claimant had restrictions based on her testimony and the positive ANA [antinuclear antibody lupus testing] findings.

Tr. 18.

Plaintiff argues the ALJ's determination was not supported by substantial evidence because he failed to adequately consider her symptoms related to lupus, which included lesions, pain, and itching of her face and scalp. Plaintiff contends these symptoms affected her ability to concentrate, maintain pace, and consistently report to work. To support her argument, Plaintiff refers to Dr. Shapiro's testimony in which he confirmed that itching and pain are two typical symptoms which an individual with Plaintiff's condition could experience. Tr. 60. Plaintiff also refers to various treatment notes documenting her reports of lesions and flare ups. ECF No. 25 at 4-10.

Contrary to Plaintiff's argument, the ALJ extensively considered treatment notes, as summarized above, which included notations of her dermatological symptoms, including visible rashes, forehead plaques, and lesion flare ups. Tr. 17-18. In analyzing these records, the ALJ took into consideration that Plaintiff's symptoms showed improvement and stability overall, especially when she was able to take her medication as directed and after she received Kenalog injections. Tr. 17-18, 305, 311, 355-57, 376, 409, 463. Various notations in the record reveal that her medication provided relief without side effects. Tr. 290 (feels improvement with Plaquenil), 305 (same), 311 (noting "significant improvement" with Plaquenil); 318 (same); 348 (noting no medication side effects); 582 (Quinacrine helps when she takes it). If an impairment can be controlled by treatment or medication, it cannot be considered disabling. *See Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010). Notably, even when Plaintiff was experiencing flare ups or in periods where she discontinued Quinacrine due to cost, Dr. Chaudhry considered her condition

16

to be stable, and in 2016 her lupus was described as "well controlled." Tr. 17, 312, 348-49, 356-57, 367, 377, 385.

As to symptoms of itching, the Court notes the record is devoid of any significant, debilitating issues which would have affected the ALJ's RFC assessment. For example, on April 25, 2016, Plaintiff "denie[d] associated pain or itching of her scalp." Tr. 356. On October 24, 2016, Plaintiff complained of an "itchy feeling in her ears" which occurred "mostly at night." Tr. 685. On October 10, 2018, Plaintiff was [n]egative for itching and rash." Tr. 586. Although Plaintiff described issues with skin irritation when exposed to the sun, her Function Report is completely devoid of any limitations related to scalp or facial itching or pain. *See* Tr. 229-35. Moreover, many of her itch-related complaints were reported outside of the relevant time period in 2018 and 2019. *See, e.g.,* Tr. 571, 649, 744, 983.

The Court finds substantial evidence of record supports the ALJ's RFC assessment, and he cannot be found to have disregarded evidence or ignored potential limitations. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (citing *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992)). Although Dr. Shapiro testified itching and pain are two typical symptoms an individual with Plaintiff's condition could experience, the record does not establish the need for more restrictive limitations than determined by the ALJ. Dr. Shapiro did not believe her condition or symptoms would interfere with her ability to work, and the substantial evidence in the record as a whole supports that opinion. Tr. 57. However, to any extent her scalp or facial itching, pain, or lesions might create a distraction during employment, the ALJ limited her from performing any

17

activities which would involve operational control of moving machinery, working at unprotected heights, or use of hazardous machinery. Tr. 15.

### B. Analysis of Plaintiff's Credibility[4]

The ALJ determined Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. Tr. 16. Specifically, the ALJ found a lack of support for "the frequency alleged" and "the severity of pain and fatigue that accompanies the flare-ups." *Id.* In making this decision, the ALJ considered that her outbreaks were localized on her face and head and did not impair her extremities; most symptom exacerbations were due to periods of non-compliance with her more expensive medication; a lack of evidence regarding medication side effects; treatment notes reflecting only mild reports of fatigue; and limited findings as to the cause of her joint pain. Tr. 18.

Plaintiff argues the ALJ's assessment of her subjective complaints was not supported by substantial evidence. Specifically, Plaintiff argues: (1) she never alleged she had outbreaks on her extremities; (2) her symptom exacerbations were not due to medication non-compliance; (3) she suffered from lipoatrophy as a side effect from Plaquenil; and (4) the ALJ failed to ask her at the hearing whether she suffered from fatigue during the relevant period. ECF No. 25 at 11-13.

---

[4] Although Plaintiff uses the term "credibility," the Court notes the Social Security Administration issued a new ruling eliminating the use of that term when evaluating a plaintiff's subjective statements of symptoms, clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017) (republished). The factors to be considered in evaluating a plaintiff's statements, however, remain the same. *See id.* at *13 ("Our regulations on evaluating symptoms are unchanged."). *See also* 20 C.F.R. §§ 404.1529, 416.929. This new ruling applies to final decisions of the Commissioner made on or after March 28, 2016.

In considering subjective complaints, the ALJ must fully consider all of the evidence presented, including observations by third parties and treating examining physicians relating to such matters as:

(1) The plaintiff's daily activities;
(2) The subjective evidence of the duration, frequency, and intensity of the plaintiff's pain;
(3) Any precipitating or aggravating factors;
(4) The dosage, effectiveness, and side effects of any medication; and
(5) The plaintiff's functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

Although the ALJ is not free to accept or reject subjective complaints based upon personal observations alone, he may discount such complaints if there are inconsistencies in the evidence as a whole. *Id.* An ALJ's findings are entitled to deference as long as they are supported by good reasons and substantial evidence. *Gregg v. Barnhart,* 354 F.3d 710, 714 (8th Cir. 2003); *see also Hogan v. Apfel,* 239 F.3d 958, 962 (8th Cir. 2001). The ALJ need only acknowledge and consider the *Polaski* factors, not explicitly discuss each one. *Eichelberger v. Barnhart,* 390 F.3d 584, 590 (8th Cir. 2004). "The credibility of a [plaintiff's] subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). *See also Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010); *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

While the Court notes the ALJ did not expressly cite to *Polaski* in his analysis, which is the Eighth Circuit's "preferred practice," the ALJ did cite to 20 C.F.R. 404.1529 and SSR 16-3, and the requirements found therein "largely mirror the *Polaski* factors." *Schultz v. Astrue*, 479

F.3d 979, 983 (8th Cir. 2007). The ALJ then proceeded to evaluate the underlying medical

record, addressing the majority of the relevant *Polaski* factors throughout his determination.

First, Plaintiff takes issue with the ALJ's statement that her "outbreaks . . . were localized

on her face and head and did not impair her extremities." ECF No. 25 at 12 (citing Tr. 18).

Plaintiff argues she never alleged that her lesions or outbreaks occurred anywhere other than on

her face and head, and, as a result, this was not a good reason to discredit Plaintiff's credibility.

While the Court agrees the record does not reveal her complaining of lesion or rash outbreaks on

her extremities, the ALJ cannot be found to have erred in incorporating this statement in his

determination. "[T]he Commissioner's review of subjective assertions of the severity of

symptoms is not an examination of a claimant's character, but rather, is an examination for the

level of consistency between subjective assertions and the balance of the record as a

whole." *See Noerper v. Saul*, 964 F.3d 738, 745 n.3 (8th Cir. 2020). Here, the ALJ found the

record was not consistent with Plaintiff's allegations regarding the *severity* of her outbreaks. The

Court finds the ALJ was merely asserting that because her outbreaks were localized to her face

and scalp, as reflected from the medical evidence, her impairments were simply not as severe as

alleged. This observation was appropriate in evaluating the degree of severity of her lupus

related symptoms.

Second, Plaintiff argues the ALJ incorrectly found that her exacerbations were

predominately during periods of noncompliance due to the expensive nature of her Quinacrine

medication. Plaintiff asserts this statement is inaccurate because Dr. Shapiro did not explicitly

attribute her flares to non-compliance, and a May 15, 2017 treatment record noted that although

she restarted her Quinacrine prescription she was "still flaring." As to Dr. Shapiro, the Court

notes he was not explicitly asked about the cause of her flare ups during the hearing. The fact he was silent as to the matter does not invalidate the ALJ's statement.

Moreover, substantial evidence in the record as a whole support that her flares were attributed to her occasional inability to take Quinacrine as prescribed. Treatment notes from November 21, 2014 indicate when she restarted Quinacrine she had "better disease control." Tr. 290. These records also reflect she experienced an interruption in treatment from 2012 to 2014 due to a loss of health care coverage, which resulted in "recurrence of inflammatory plaques on scalp." *Id.* Treatment notes from April 27, 2015 and September 14, 2015, indicate significant improvement after she restarted Quinacrine. Tr. 311, 318. On January 25, 2016, Dr. Chaudhry noted, "Mild flare. Had been off [Q]uinacrine due to cost." Tr. 347. On April 25, 2016, Dr. Chaudhry wrote Plaintiff had improvement since restarting Quinacrine, and her condition historically "cleared up" when she was able to take both of her medications. Tr. 355. On September 26, 2016, she was noted to be taking her medications as directed, and her condition was described as "well controlled." Tr 367. On February 3, 2017, Dr. Chaudhry indicated she was experiencing a greater flare and was "off [Q]uinacrine since early December due to cost, insurance [does] not cover." Tr. 384. She was directed to restart her prescription because her lupus was "more active on exam . . . than in the past." Tr. 386. On May 15, 2017, Dr. Chaudhry explicitly attributed her previous flare to being out of Quinacrine. Tr. 406. Although she was still experiencing a flare during this visit, Dr. Chaudhry noted that Plaintiff felt as if her "skin condition improved some" since resuming her medication, although the improvement was not as much as anticipated. Tr. 407-09. These records overwhelmingly reflect her exacerbations were, as the ALJ noted, predominately during periods when she was off her Quinacrine treatment.

The Court also finds it significant that Plaintiff occasionally declined Kenalog injection treatment, despite improvement, because she wanted to avoid the pain associated with an injection. Tr. 17, 355, 375-76. She also declined recommended medication adjustments from Dr. Chaudhry because she was stressed about her mother and did "not want to decide about any other [treatment]." Tr. 17, 409, 411. *See Selby v. Astrue,* No. C06-3057-MWB, 2008 WL 131063 (N.D. Iowa Jan. 10, 2008) (finding plaintiff lacked credibility in part because she "declined treatment options that had provided her relief in the past"). Plaintiff admitted, albeit outside of the relevant period, that she prioritizes taking care of her family over maintaining consistency with her treatment. Tr. 598.

Third, Plaintiff argues the ALJ incorrectly determined she had no significant side effects from her medication. On the contrary, substantial evidence supports the ALJ's conclusion. Medical records from December 19, 2014, January 25, 2016, September 26, 2016, and February 13, 2017, explicitly state she was "tolerating the medications" and had no side effects. Tr. 348, 299, 365-66, 386. On April 25, 2016, Plaintiff denied all side effects, except fatigue. Tr. 356. Although Plaintiff argues lipoatrophy was a side effect to her medication, the record reflects otherwise. On December 19, 2014, Dr. Chaudhry indicated "her form of lipoatrophy [was] likely related to her lupus" and was advised *before* being re-prescribed Plaquenil that it "potentially could make things worse," but because she already had severe lipoatrophy Plaintiff wanted to proceed with the prescription. Tr. 298.

Lastly, Plaintiff argues the ALJ incorrectly determined she did not report fatigue, and when she did, it was mild. The Court finds that this argument fails because substantial evidence supports her reports of only mild symptoms of fatigue. During the relevant period, there are limited instances of fatigue complaints. For example, on November 21, 2014, Plaintiff

22

complained of "occasional fatigue." Tr. 290. Treatment notes from January 5, 2016, describe her fatigue as "mild," Tr. 327, and on January 25, 2016, she denied fatigue. Tr. 348. In fact, many of her complaints of significant fatigue are documented in records from 2018 and 2019, which are outside of the relevant period. *See* Tr. 564-65, 576, 650, 654-56, 669. The ALJ's determination was based on the medical record, and he had no requirement to specifically ask her about fatigue during the hearing. Plaintiff bears the burden of proving her RFC. *See Moore*, 572 F.3d at 523.

In conclusion, the Court finds the ALJ's RFC determination is consistent with the relevant evidence of the record as a whole, including the objective medical evidence and the observations of medical providers, as well as the medical opinion evidence and the evaluation of Plaintiff's subjective complaints.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff Unice M. Simmons' Complaint is **DISMISSED, with prejudice**. A separate judgment will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Kilolo Kijakazi for Andrew M. Saul in the court record of this case.

So Ordered this 9th day of February, 2022.

*/s/ Stephen R. Welby*
STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE